UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 22-60279-CIV-SINGHAL/VALLE

MICHAEL ROLDAN,

     Plaintiff,

v.

CITY OF HALLANDALE BEACH, *et al.*,

     Defendants.

_____/

## **ORDER**

**THIS CAUSE** is before the Court on Defendants' Motion for Final Summary Judgment and Supporting Memorandum of Law ("Defendant's Motion for Summary Judgment") (DE [57]) and Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability (DE [60]).  Defendants filed their Statement of Undisputed Material Facts (DE [58]) in conjunction with their Motion for Summary Judgment (DE [57]).  Plaintiff filed his Response in Opposition to Defendants' Motion for Partial Summary Judgment (DE [76]) and an accompanying Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment (DE [75]).  Defendants filed a Reply in Support of their Motion for Summary Judgment (DE [81]) and a Reply Statement of Facts in Support of the Motion for Summary Judgment (DE [82]).  Plaintiff filed his Motion (DE [60]) along with a supporting Statement of Material Facts (DE [59]).  Defendants filed an Opposition to Plaintiff's Motion (DE [74]) and a Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment (DE [75]).  Plaintiff filed his Reply in Support of his Motion (DE [84]) and a Reply Statement of Material Facts (DE [85]).  The parties have also filed

video evidence in support of their motions.  Accordingly, the matter is fully briefed and ripe for review.

## I.   <u>PROCEDURAL HISTORY</u>

This is a case of a mistaken identity.  On May 13, 2019, at approximately 6:23 p.m., a woman reported to the Miramar Police Department ("Miramar") that her boyfriend, Otniel Lorente ("Lorente" or the "suspect"), had battered her.  Miramar then asked the City of Hallandale Beach Police Department ("Hallandale Beach" or the "City") to detain Lorente in a Hallandale Beach apartment complex.  Hallandale Beach dispatched six of its officers–Michael Termaat ("Officer Termaat"), Richard Icobelli ("Officer Icobelli"), Todd Crevier ("Officer Crevier"), Christian Casanova ("Officer Casanova"), Miguel Mirabal ("Officer Mirabal"), and Pietro Roccisano ("Officer Roccisano") (each a "Defendant" and, collectively with "Hallandale Beach," "Defendants")—to Lorente's apartment complex. The officers received a probable cause affidavit to apprehend Lorente along with a photo of the suspect and a description of his vehicle.  Defendants did not have the suspect's apartment number.

Plaintiff Michael Roldan ("Plaintiff") also happened to reside in the very apartment complex to which Defendants were directed.  Officers observed a vehicle matching the description of Lorente's car directly in front of Plaintiff's apartment and, once Plaintiff answered the door, noticed a similarity between Plaintiff and the suspect's photo.  Officers Icobelli and Termaat entered Plaintiff's apartment with no warrant and without verbal consent from Plaintiff.  Officer Termaat handcuffed Plaintiff in his kitchen while the other officers worked to confirm Plaintiff's identity.  Plaintiff was in handcuffs for just over five minutes and the officers remained on site, in his home, for an additional forty minutes

until Miramar could confirm that Plaintiff was not Lorente.  Nearly every relevant fact was captured on video as recorded by body cameras worn by the Hallandale Beach officers who were present at the scene of the subject incident.[1]

Minutes into the encounter, all parties realized that this was a mistake. Officer Termaat told Plaintiff he was "going to have a good story on how dumb the Hallandale Beach police officers were."  Termaat BWC, at 05:07-05:19.  The officers apologized to Plaintiff.  Plaintiff even hugged Officers Termaat and Casanova.  Still, Plaintiff informed the officers that this would not "end here" and brought the instant action.  The issue before the Court today is whether, on the record presented, Defendants are entitled to summary judgment as a matter of law.  The Court finds that material disputes of fact exist that preclude summary judgment as to Officers Termaat and Icobelli.  As for all remaining defendants–Hallandale Beach and Officers Crevier, Casanova, Mirabal, and Roccisano–this Court finds that summary judgment is appropriate on some claims and not others, as set forth more fully below.

On February 2, 2022, Plaintiff filed an eight-count Complaint (DE [1]) alleging unreasonable seizure (Count I) and unreasonable search (Count II) against all officers for violations of his Fourth Amendment rights, false arrest against the officers (Count III) and the City (Count IV), trespass against the officers (Count V) and City (Count VI), and invasion of privacy against the officers (Count VII) and City (Count VIII).  Defendant, Hallandale Beach, filed its Answer and Affirmative Defenses to Plaintiff's Complaint ("Hallandale Beach's Answer") (DE [14]) on March 10, 2022, and the officers filed their Answer and Defenses to Plaintiff's Complaint ("Officers' Answer") on May 16, 2022.

---

[1] This Court will refer to Defendants' Notice of Conventional Filing (DE [69]) as Defendants' Video Exhibits (DE [69]) and Plaintiff's Notice of Conventional Filing as Plaintiff's Video Exhibits (DE [64]).

In support of their Motion for Summary Judgment (DE [57]), Defendants conventionally filed a USB drive containing the following video recordings:  Video 1, the Body-Worn Camera Footage of Officer Christian Casanova ("Defendants' Exhibit 8"); Video 2, the Body-Worn Camera Footage of Officer Richard Icobelli ("Defendants' Exhibit 9"); and Video 3, the Body-Worn Camera Footage of Officer Michael Termaat ("Defendants' Exhibit 10").  *See* (Defendants' Notice of Conventional Filing (DE [70]), filed December 29, 2022).

In support of his Partial Motion for Summary Judgment (DE [60]), Plaintiff conventionally filed a USB drive containing the following video recordings:  Video 1, the Body-Worn Camera Footage of Officer Richard Icobelli ("Plaintiff's Exhibit 5"); Video 2, the Body-Worn Camera Footage of Officer Michael Termaat ("Plaintiff's Exhibit 16"); and Video 3, the Body-Worn Camera Footage of Officer Christian Casanova ("Plaintiff's Exhibit 17").  *See* (Plaintiff's Notice of Conventional Filing (DE [64]), filed December 29, 2022).[2]

## II.   **BACKGROUND FACTS**

On May 13, 2019, at approximately 6:23 p.m., Fabiola Sosa Polanco visited the Miramar Police Department to report that her then boyfriend, Lorente, had battered her. Defendants' Statement of Facts in Support of its Motion for Summary Judgment (Defs.' SOMF (DE [58]) at ¶1); Plaintiff's Statement of Facts in Support of its Motion for Partial Summary Judgment (Pl.'s SOMF (DE [59]) at ¶1).  Based on these allegations, Officer Michael Maleta of the Miramar Police Department ("Officer Maleta") brought charges

---

[2] Upon review, each party has conventionally filed the same three videos:  Body-Worn Camera Footage of Officer Casanova ("Casanova BWC"), Body-Worn Camera Footage of Officer Icobelli ("Icobelli BWC"), and Body-Worn Camera Footage of Officer Termaat ("Termaat BWC").  For simplicity, this Court will cite to each video rather than the individual exhibits.

against Lorente and asked the City of Hallandale Beach Police Department to apprehend him.  *See* (Pl.'s SOMF (DE [59]) at ¶¶2–3); (Defs.' SOMF (DE [58]) at ¶2).  Miramar provided Hallandale Beach with the address of an apartment complex where Lorente might be found,[3] but did not include an apartment number.  *See* (Pl.'s SOMF (DE [59]) at ¶7); (Defs.' SOMF (DE [58]) at ¶3).  The responding officers received a photograph of Lorente and the make and model of his vehicle.  *See* (Defs.' SOMF (DE [58]) at ¶6); (Pl.'s SOMF (DE [59]) at ¶4).  Defendants did not have a warrant to apprehend Lorente.  *See* (Pl.'s SOMF (DE [59]) at ¶13).  Rather, Miramar provided Defendants with a probable cause affidavit to seize him.  *Id.* at ¶15; (Defs.' SOMF (DE [58]) at ¶4).

The officers reached the Hallandale Beach apartment complex sometime around midnight on May 14, 2019.  *See* (Pl.'s SOMF (DE [59]) at ¶20).  As the officers searched the apartment complex, they located a vehicle that matched the description of Lorente's parked outside of the window in the last apartment in the building.  *See* (Defs.' SOMF (DE [58]) at ¶7); (Pl.'s Opp. SOMF (DE [75]) at ¶7) ("Disputed in part.  The vehicle was parked to the apartment complex.").  Officers Icobelli and Termaat were among the first to approach Plaintiff's apartment.[4]  *See* Termaat BWC 16 at 00:00–00:20.

Officer Icobelli knocked on Plaintiff's door and stepped to the left onto an adjacent staircase.  *See* (Defs.' SOMF (DE [58]) at ¶8); (Pl.'s SOMF (DE [59]) at ¶20); Termaat BWC at 00:20-00:27.  As soon as Plaintiff answered the door, Officer Icobelli descended

---

[3] The parties agree that Miramar provided a nonexistent address to Hallandale Beach (321 NE 1ST ST, Hillandale Beach, FL 33155).  *See* Defendants' Statement of Facts in Opposition to Plaintiff's Motion for Summary Judgment (Defs.' Opp. SOMF (DE [73] at ¶5); Plaintiff's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment (Pl.'s Opp. SOMF (DE [75] at ¶6).  The parties also agree that Defendants arrived to Plaintiff's apartment complex, 321 NE 1ST CT, Hallandale Beach, FL 33009.  *See* (Pl.'s SOMF (DE [59]) at ¶6).

[4] Body-Worn Camera footage for Officer Icobelli, as filed by both parties, is six minutes and 41 seconds (06:41) in length and begins after Plaintiff is already in handcuffs.

from the staircase, approached the center of the doorway, and stepped in front of Plaintiff's home. *See* Termaat BWC at 00:30-00:40. Officer Icobelli asked Plaintiff for his name as Officer Termaat approached Plaintiff's doorway from the right. *Id.* at 00:33–00:40. Plaintiff answered, "Mike" and Officer Icobelli asked Plaintiff about other occupants in the apartment. *Id.* at 00:35–00:40; *see* (Pl.'s SOMF (DE [59]) at ¶21). At the same time, Officer Termaat asked Plaintiff, "Otniel?" and asked for his last name in an apparent attempt to confirm Plaintiff's identity. Termaat BWC at 00:39-00:44. Officer Icobelli then stepped into Plaintiff's apartment and Plaintiff appears to take a half-step back in response. *Id.* Plaintiff responded "Roldan" to Officer Termaat and then Officer Termaat directed Officer Icobelli to "go on in, go on in" and the two officers walked further into Plaintiff's home. *Id.* at 00:42-00:50; (Pl.'s SOMF (DE [59]) at ¶¶23–24); (Defs.' Opp. SOMF (DE [73] at ¶¶23–24) (Undisputed). Officer Icobelli then asked Plaintiff if he had any identification on him, to which Plaintiff responded "yeah," and then Officer Icobelli asked "who else is in here with you?" *See* Termaat BWC at 00:44-00:52. Perhaps in confusion, Plaintiff responded, "Mike." *Id.* Officer Icobelli repeated his question and Plaintiff answered that his mom and dad were in the apartment with him. *Id.* Officer Termaat then noted, "I think this is our guy," and Plaintiff is heard saying, "you're scaring me." *Id.* at 00:52-00:58; (Pl.'s SOMF (DE [59]) at ¶26); (Defs.' Opp. SOMF (DE [73]) at ¶26) ("Undisputed that when asked who else is in the apartment, Roldan responded, "My mom and dad. You are scaring me."). At this point, Plaintiff was standing to the side of his kitchen island, where various kitchen appliances on the counter around Plaintiff and two sets of counter knives can be seen behind him, within arm's reach. Termaat BWC, at 00:50-01:05. Officer Termaat handcuffed Plaintiff while the other officers worked to

confirm Plaintiff's identity. *See* (Defs.' SOMF (DE [58]) at ¶13); (Pl.'s Opp. SOMF (DE [75]) at ¶13) ("Disputed in part. Undisputed that [Termaat] and Icobelli stepped inside of Roldan's apartment."). Officers Termaat and Icobelli again asked Plaintiff for his "name" and, after Plaintiff replied "Michael," Officer Icobelli asked Plaintiff for his "real name." *Id.* at 01:00-01:18. Plaintiff repeatedly answered, "Michael" or "Michael Roldan." *Id.* Officer Icobelli replied, "no it's not, man" and Officer Termaat added, "No, your name is Otniel Lorente." *Id.* Officer Icobelli then showed Lorente's photograph to Plaintiff and Plaintiff exclaimed, "that's not me!" *See id.* at 01:25-01:32; (Pl.'s SOMF (DE [59]) at ¶31) (Defs.' Opp. SOMF (DE [73] at ¶31) ("undisputed that Roldan relied, "That's not me."). Plaintiff offered to show his identification to the officers but said he did not have his ID card on his person. *Id.* at 01:18-01:47. Officer Mirabal stepped inside the apartment while Officers Termaat and Icobelli secured Plaintiff. *See* Termaat BWC, 01:04-01:10.

Shortly thereafter, Plaintiff's mother, Maria Mendez ("Mrs. Mendez"), appeared in the kitchen, confirmed Plaintiff's identity as "Michael Roldan," and stated that Plaintiff did not have a car. *See* Termaat BWC, 01:49-01:58; (Pl.'s SOMF (DE [59]) at ¶33); (Defs.' Opp. SOMF (DE [73]) at ¶33) ("Undisputed that Roldan's mother identified Roldan as "Michael Roldan."). Roldan asked his mother to retrieve his ID. Termaat BWC at 01:58-02:03. Officer Termaat then assured Plaintiff that the officers would "straighten it out" and "be on [their] way." *Id.* at 02:04:-02:14. Officer Termaat checked to see if Plaintiff had any weapons on his person and added, "If it's mistaken ID then it is" and told Plaintiff not to worry. *Id.* at 02:20-02:30.

Officers Icobelli and Mirabal stepped outside, at which point Officer Termaat was alone in the apartment. *See* (Defs.' SOMF (DE [58]) at ¶15); (Pl.'s Opp. SOMF (DE [75]),

at ¶15) ("Undisputed Icobelli and Mirabal exited the apartment and [Termaat] was left as the only officer inside of apartment."). Mrs. Mendez left the officers' sight to search for Plaintiff's identification and Officer Termaat said to Officer Casanova, "Do me a favor and watch mom?" *See* Termaat BWC, at 02:37-02:45. Casanova then stepped into Plaintiff's apartment. *See* (Defs. SOMF (DE [58]) at ¶17); (Pl.'s Opp. SOMF (DE [75]) at ¶17) ("Disputed in part. Undisputed that Casanova entered the apartment and Roldan's mother was searching for Roldan's identification."); Termaat BWC at 02:44-02:50. Mrs. Mendez confirmed Plaintiff's identity as Michael Roldan. Termaat BWC, at 05:02-05:07. Officer Termaat told Plaintiff that he would "have a good story when we're done with this about how dumb the Hallandale Police were" and that they were just "doing [their] jobs, making sure [Roldan] was not the right guy." *Id.* at 05:07-05:19.

Around the same time, Officer Icobelli showed Lorente's photograph to Officer Crevier and Officer Crevier entered Plaintiff's apartment to verify Plaintiff's identity. *See* Termaat BWC at 04:35, Icobelli BWC at 02:47, 03:04-04:07. Officer Crevier then instructed Officer Icobelli to remove Plaintiff's handcuffs. *See* Icobelli BWC at 04:02. Per Officer Crevier's instruction, Officer Icobelli told Officer Termaat to uncuff Plaintiff. *See* Termaat BWC at 05:58; Icobelli BWC at 04:07. In all, Plaintiff was in handcuffs for five minutes and 37 seconds. *See* Termaat BWC, at 01:04-06:41.

Once Plaintiff was no longer in handcuffs, he briefly stepped away from the kitchen while the officers remained near the front of the apartment with Mrs. Mendez. *See id.* at 06:50-07:05. He returned to the kitchen and instructed Officer Termaat to "give [him] all his shit back" and told the officers to "get the fuck out of here." *Id.* at 07:00-07:12. When Plaintiff left the kitchen again, Officer Termaat asked Mrs. Mendez if she had seen the

8

photograph of Lorente.  *Id.* at 7:30-7:35.  Mrs. Mendez replied that the photograph looked "a little bit" like Plaintiff but maintained that it was "not him."  *Id.*  Mrs. Mendez then asked, "what are we waiting for now?" and Officer Termaat replied that they were waiting for the Miramar Police Department to "acknowledge that this was a mistake."  *Id.* at 11:12-11:18. Plaintiff then asked Officers Casanova and Termaat if he could get an apology and both officers said "sorry."  *Id.* at 11:20-11:30.

After Officer Termaat removed Plaintiff's handcuffs, Officer Termaat exited the apartment and asked Officer Crevier if they were going to "bring[] this to some sort of resolution."  *Id.* at 13:00-13:35.  Officers Icobelli and Crevier respond that they are waiting for the Miramar police officer.  *Id.* at 13:35-13:37.

Plaintiff began crying and Officer Casanova explained the circumstances surrounding their decision to handcuff him.  *Id.* at 14:37-15:00.  During this conversation, Mrs. Mendez told Plaintiff that he looked "a little bit" like the photograph of Lorente.  *Id.* at 14:49-14:52.  Plaintiff appeared calmer and turned to hug Officer Termaat.  14:59-15:02. Officer Casanova extended his hand, which Plaintiff shook, and then Plaintiff hugged Officer Casanova as well.  15:02-15:06.  Once Officer Maleta arrived, he requested Plaintiff's fingerprint to confirm his identity and Plaintiff complied with the request.  *See* Casanova BWC, at 36:16-37:10.  Sergeant Roccisano then entered Plaintiff's home without consent.  *See* (Pl.'s SOMF (DE [73]) at ¶57); (Defs.' Opp. SOMF (DE [75]) at ¶57 ("Undisputed that Sergeant Roccisano did not receive consent from Roldan to enter the apartment.").  Sergeant Roccisano told Officer Casanova that Lorente had a neck tattoo and Officer Casanova replied that he knew.  *See* (Pl.'s SOMF (DE [73]) at ¶58); (Defs.' Opp. SOMF (DE [75]) at ¶58) ("Undisputed that Sergeant Roccisano told Officer

Casanova that the suspect had a tattoo on his neck and Officer Casanova replied that he knew.").  The officers exited Plaintiff's home after approximately forty-five minutes.  *See* Termaat BWC, at 00:39-46:35.

### III.  <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a));[5] *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  An issue is "genuine" if a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).  And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756

---

[5] The 2010 Amendment to Rule 56(a) substituted the phrase "genuine dispute" for the former "'genuine issue' of any material fact."

F.3d 1326, 1333 (11th Cir. 2014).  However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf."  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).  "[T]his, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments."  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

## IV.   DISCUSSION

Defendants contend that they are entitled to judgment as a matter of law as to all claims asserted in Plaintiff's Complaint.  Defendants' Motion, however, only requests summary judgment on all claims for Officers Casanova, Crevier, Mirabal, and Roccisano. As to Officers Termaat and Icobelli, Defendants "concede that there is an issue of fact related to their entry of the home."  *See* (Defs.' Mot. (DE [57]) at 2, n.1).  All Officers maintain that they are entitled to qualified immunity on Plaintiff's Fourth Amendment claims, and to statutory immunity on Plaintiff's claims for false imprisonment/arrest, trespass, and invasion of privacy pursuant to Fla. Stat. § 768.28(9)(a).  Immunity notwithstanding, all Defendants maintain that they did not unlawfully seize, search, falsely arrest, trespass against, or intrude upon, Plaintiff and his home.

Plaintiff opposes Defendants' motion ("Pl.'s Opp.") (DE [76]) and filed a separate, cross-motion for partial summary judgment on the issue of liability ("Pl.'s Mot.") (DE [60]). In his opposition, Plaintiff contends that the doctrine of qualified immunity is unconstitutional.  (Pl.'s Opp. (DE [76]) at 2-3).  Specifically, Plaintiff maintains that qualified immunity is (i) a-textual, with no reference to immunities or defenses for

violations under the plain language of 42 U.S.C. §1983 as first adopted; (ii) ahistorical, insofar as it is unsupported by common law; and (iii) unconstitutional as a violation of the separation of powers doctrine.

In Plaintiff's cross-motion (DE [60]), as in his opposition (DE [76]) and reply in support of his cross-motion (DE [84]), he argues that the Officers violated his Fourth Amendment rights when they entered his home without a warrant, consent, or any exigent circumstances.   Plaintiff argues that he was unlawfully seized by the officers and characterizes his detention as a warrantless arrest without probable cause.   In the alternative, Plaintiff maintains that the encounter was an unlawful stop where the officers did not have reasonable suspicion and held Plaintiff for longer than necessary.  As for his state law claims, Plaintiff argues that the officers falsely arrested him, trespassed upon his apartment, and invaded his privacy by entering his home.

Defendants oppose Plaintiff's partial motion ("Defs.' Opp.") (DE [74]) and filed a reply in support of their motion (Defs.' Reply) (DE [81]).  Defendants maintain that Plaintiff was not arrested where Officer Termaat handcuffed Plaintiff for officer safety based upon his reasonable suspicion that Plaintiff was a violent suspect.  As for Plaintiff's trespass claim, Defendants add that Plaintiff cannot assert a trespass claim where he enjoys no ownership or possessory interest in the home.  Alternatively, Defendants cite to Plaintiff's implied consent as a defense to his trespass claim.  Defendants contend that Plaintiff's invasion of privacy claim fails where the officers conduct was not highly offensive to a reasonable person.  Defendants argue that they are immune from suit under qualified and statutory immunity.

**A.  Unreasonable Search and Seizure (Counts I and II)**

Plaintiff's two Fourth Amendment claims—for unreasonable search and seizure—are subject to the doctrine of qualified immunity.  Qualified immunity "protects government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 232, (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In imposing liability for violations of clearly established law, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*

"An officer asserting a qualified-immunity defense bears the initial burden of showing that he was 'acting within his discretionary authority.'"  *Piazza v. Jefferson Cty.*, 923 F.3d 947, 951 (11th Cir. 2019).  Once an officer has shown that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  To satisfy his burden, Plaintiff must show that the officers (i) violated a constitutional right, which (ii) was clearly established at the time of the alleged violation.  *Pearson*, 555 U.S. at 232; *Piazza*, 923 F.3d at 951.  While we may consider the two prongs in either order, "an official is entitled to qualified immunity if the plaintiff fails to establish either."  *Piazza*, 923 F.3d at 951.

Plaintiff begins by challenging the constitutionality of the qualified immunity doctrine.  And, Plaintiff is not alone in questioning its viability.  Indeed, circuit judges in

our own appellate court and in other circuits have taken issue with the doctrine as it is applied today.  *See Sosa v. Martin Cnty.*, Fla., 57 F.4th 1297, 1303 (11th Cir. 2023) (Jordan, J., concurring) ("If federal statutes are supposed to be interpreted according to ordinary public meaning and understanding at the time of enactment, and if § 1983 preserved common-law immunities existing at the time of its enactment, the qualified immunity doctrine we have today is regrettable.  Hopefully one day soon the Supreme Court will see fit to correct it.") (citations omitted); *Rogers v. Jarrett*, No. 21-20200, 2023 WL 2706752, at *7 (5th Cir. Mar. 30, 2023) (Willett, J., concurring) ("All to say, the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act expressly included such language. . . *But however seismic the implications of this lost-text research*, [a]s middle-management circuit judges, *we cannot overrule the Supreme Court*.") (citations omitted) (emphasis added).  Until there is clear, binding authority holding otherwise on the doctrine of qualified immunity, we are compelled by controlling precedent to apply it.

Thus, similarly, even if warranted, vertical *stare decisis* precludes this Court from ruling in the way Judges Jordan and Willett seem to suggest above.  Plaintiff recognizes this restraint in his Response in Opposition to Defendant's Motion for Partial Summary Judgment (DE [76] at fn. 1), but he also correctly analyzes the law and summarizes the cases that illustrate the qualified immunity doctrine is not supported by the text, history or structure of 42 U.S.C. §1983.  Qualified immunity is a public policy based judicial determination that usurps the work of the legislature.  Because the legislature did not do the work, we must assume it declined to do so.  And because it declined to do so, such

policy-based decisions are not for the judiciary to make in the legislature's stead.  Writing

for a unanimous (8-0) Supreme Court in a related but different context, Justice Thomas

noted, "there may be policy reasons why Congress may wish to shield Government

employees from personal liability, and Congress is free to do so.  But there are no

constitutional reasons why we must do so in its stead.  To the extent [we are asked] to

create a new policy-based presumption against damages against individual officials, we

are not at liberty to do so.  Congress is best suited to create such a policy.  Our task is

simply to interpret the law as an ordinary person would." *Tanzin v. Tanvir*, 592 U.S. ___,

141 S.Ct. 486, 493 (2020).

Notwithstanding his constitutional challenge to the doctrine of qualified immunity,

Plaintiff does not contest that Defendants were performing a discretionary function in the

course and scope of their official duties.  *See* (Pl. Opp. (DE [76]) at 4).  In other words,

Plaintiff concedes that Defendants have met their burden.  Accordingly, we now examine

whether the official violated Plaintiff's constitutional rights, and, if so, "whether the [rights]

were clearly established" at the time of the alleged conduct.  *Pearson,* 555 U.S. at 815-

16.

"[T]he 'physical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed.'"  *Morris v. Town of Lexington Alabama*, 748 F.3d 1316,

1322 (11th Cir. 2014) (citing *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal

citation omitted)).  "The Fourth Amendment generally prohibits the warrantless entry of a

person's home, whether to make an arrest or to search for specific objects."  *Illinois v.*

*Rodriguez*, 497 U.S. 177, 181 (1990).  "The prohibition does not apply, however, to

situations in which voluntary consent has been obtained.  *Id.*  Where an officer enters a

home without consent and without a warrant, "any resulting search or seizure violates the Fourth Amendment unless it was supported by probable cause and exigent circumstances." *Hardigree v. Lofton*, 992 F.3d 1216, 1224 (11th Cir. 2021). In the absence of probable cause, an officer may be entitled to qualified immunity if he has "arguable probable cause." *Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018). Arguable probable cause exists where a reasonable officer in the same circumstances and with the same knowledge as the defendant "could have believed that probable cause existed" to effectuate the arrest. *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998).

     a.  <u>Unlawful Entry, Officers Termaat and Icobelli</u>

The two officers to first enter Plaintiff's home—Officers Termaat and Icobelli—have not moved for summary judgment as to Plaintiff's unlawful entry claims. *See* (Defs. Mot. (DE [57]) at 7-8. In fact, Officers Termaat and Icobelli concede that a factual issue exists as to their entry of Plaintiff's home. *See id.* at 2, n.1. Even with the benefit of body-worn camera footage, the circumstances surrounding Officer Icobelli and Termaat's entry are open to interpretation. The only available body-worn camera of the entry is from Officer Termaat and Plaintiff is only partially visible as the officers entered the premises. *See* Termaat BWC, at 0:20-0:50. The partial video can arguably favor either party. On the one hand, Plaintiff contends that Officers Icobelli and Termaat entered his home without his consent. *See* (Pl. Mot. (DE [60]) at 7. On the other hand, Defendants maintain, albeit in connection with Plaintiff's trespass claim, that Plaintiff impliedly consented to their entry. *See* (Defs. Mot. (DE [57]) at 12-13) ("Roldan stepped back and permitted the officers to enter the property."). While Plaintiff can be seen taking what is, at most, a half-

step back, this Court strains to read that as implied consent based on the video footage alone. *See id.* at 00:39-00:44. This type of factual dispute is central to Plaintiff's Fourth Amendment claims against Officers Termaat and Icobelli and cannot be resolved at the summary judgment stage. *See Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied.").

This Court, therefore, need not determine whether Officers Termaat and Icobelli violated Plaintiff's Fourth Amendment rights as to the unlawful entry. This Court, likewise, need not determine today whether the asserted right was clearly established. Consequently, Plaintiff's Partial Motion for Summary Judgment (DE [60]) is **DENIED** as to Plaintiff's unlawful entry claim against Officers Icobelli and Termaat (Count II).

### b.   Unlawful entry, Officers Casanova, Crevier, Mirabal, and Roccisano

The four remaining Hallandale Beach Officers, Officers Casanova, Crevier, Mirabal, and Roccisano move for summary judgment on Plaintiff's unlawful entry claims. *See* (Defs. Mot. (DE [57]) at 7-8). Defendants argue that they are entitled to qualified immunity where they were responding merely as back up officers. *See* (Defs. Mot. (DE [57]) at 8). Defendants maintain that, as back up officers, they were not present when Officers Termaat and Icobelli entered the property and were not privy to the circumstances leading to their entry. *See id.* Plaintiff argues that the officers were more than back up officers because they were "actively involved" in the search and seizure. *See* (Pl. Opp. (DE [76]) at 7).

The Eleventh Circuit has granted qualified immunity to assisting officers where "there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a Fourth Amendment violation." *Shepard v. Hallandale Beach Police Dep't.*, 398 F. App'x 480, 483 (11th Cir. 2010). This is so "even when the primary officer is not entitled to qualified immunity." *Id*; *see also Brent v. Ashley*, 247 F.3d 1294, 1305–06 (entitling officers who assisted in an unauthorized strip search to qualified immunity where the officers had no reason to suspect a constitutional violation and, in any event, acted reasonably).

Though each officer entered Plaintiff's home, they played ancillary and minimal roles in the incident. Officers Mirabal and Roccisano remained at or near the doorway to Plaintiff's home throughout the incident. *See* (Mirabal Decl. (DE [58-5]) at ¶15); (Roccisano Decl. (DE [58-7]) at ¶¶11–17). Officer Crevier mistakenly believed that he merely leaned into the doorway of Plaintiff's apartment to see whether Plaintiff resembled the suspect's photo. *See* Crevier Decl. (DE [58-6] at ¶¶14–15). Only after reviewing body-worn camera footage during his deposition did Officer Crevier realize that he had inadvertently stepped his foot inside of Plaintiff's apartment. *Id.* at ¶¶18–19. Finally, while Officer Casanova veered farthest into Plaintiff's apartment when he observed Mendez as she searched for Plaintiff's ID, he did so in response to Officer Termaat's request for him to "do [him] a favor" and to "watch mom." *See* Termaat BWC, at 02:37-02:45.

Here, nothing in the record indicates that the assisting officers–Officers Casanova, Crevier, Mirabal, and Roccisano–knew that Officers Icobelli and Termaat entered Plaintiff's home without consent. Officer Mirabal was the first to enter Plaintiff's home after Officers Icobelli and Termaat, and he arrived to the scene nearly a minute after the

alleged unlawful entry.  *See* Termaat BWC, 01:04-01:10.  Plaintiff did not tell any of the assisting officers not to enter or to leave immediately after their entrance.  And once these officers were inside Plaintiff's home, they acted reasonably.  Therefore, Officers Casanova, Crevier, Mirabal, and Roccisano are entitled to qualified immunity based on their ancillary and limited roles in the incident.  Accordingly, Defendants' Motion for Summary Judgment (DE [57]) is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment (DE [60]) is **DENIED** as to Plaintiff's unlawful entry claim against Officers Casanova, Crevier, Mirabal, and Roccisano (Count II).

a.  Unreasonable Seizure, Officer Termaat

The parties agree that no genuine issues of material fact preclude summary judgment as to Officer Termaat's seizure of Plaintiff.  Defendants argue that Officer Termaat is entitled to qualified immunity on this claim because he handcuffed Plaintiff merely to "maintain the status quo" while the officers worked to determine Plaintiff's true identity.  *See* (Defs.' Mot. (DE [57]) at 6).  Defendants contend that the handcuffing was "minimally invasive" and "solely designed to keep Plaintiff secure until the investigation could be completed.  *Id.*  Plaintiff argues that the officers, Termaat and all others, are not entitled to qualified immunity where the encounter amounted to a warrantless stop absent consent or exigent circumstances.  *See* (Pl.'s Mot. (DE [60]) at 6-7).  Plaintiff also contends that the officers lacked probable cause to handcuff Plaintiff.  Defendants argue that Officer Termaat "possessed reasonable suspicion to detain Plaintiff."  *See* (Defs.' Mot. (DE [57]) at 9); (Defs.' Opp. (DE [74]) at 6-7).  Alternatively, Defendants argue that the officers possessed "arguable probable cause" to handcuff Plaintiff.  *See* (Defs.' Opp. (DE 75]) at 5-6).

"An arrest is quintessentially a seizure of a person, and therefore subject to the Fourth Amendment's reasonableness requirement."  *McClish v. Nugent*, 483 F.3d 1231, 1238 (11th Cir. 2007).  An in-home arrest "is plainly subject to the warrant requirement; probable cause alone is insufficient."  *Id.*  Short of an arrest, officers are generally entitled to perform a *Terry* stop, or a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *See Terry v. Ohio*, 806 F.3d 1036, 1044 (11th Cir. 2015).  This is certainly true in public places and even at the threshold of a home.  *See e.g., United States v. Lester*, 477 Fed. Appx. 697, 698 (11th Cir. 2012); *United States v. Williams*, 185 Fed. Appx. 866, 869 (11th Cir. 2006).  Once an officer breaches the threshold, however, "a warrant (or exception) is *always* required for a home arrest, 'even if the arrestee is standing in the doorway of his home when the officers conduct the arrest.'"  *See Bailey v. Swindell*, 940 F.3d 1295, 1303 (11th Cir. 2019) (quoting *Moore v. Pederson*, 806 F.3d 1036, 1050 n.14 (11th Cir. 2015)).

Officer Termaat handcuffed Plaintiff in his kitchen within seconds of entering the apartment.  Termaat BWC, at 00:50-01:05.  He understood, albeit mistakenly, that Plaintiff was the violent suspect that the officers were dispatched to detain.  Defendants argue that Officer Termaat handcuffed Plaintiff to maintain officer safety.  Indeed, in the body-worn camera footage, Plaintiff is seen in his kitchen and within arms-reach of appliances on all four sides of him.  Termaat BWC, at 00:50-01:05.  This includes two block sets of knives, a toaster oven, and even a fishbowl which, in an alternative set of circumstances, could have been weaponized to harm the officers.  *Id.*  Once Plaintiff was in handcuffs, the officers did not idle.  Rather, they worked to confirm Plaintiff's identity and ultimately removed the handcuffs shortly after Mendez presented the officers with Plaintiff's

identification.  In all, Plaintiff was in handcuffs for five minutes and thirty-seven seconds.
*See* Termaat BWC, at 01:04-06:41.

Defendants' characterization of Plaintiff's detention is more akin to a *Terry* stop.
Had Defendants executed a *Terry* stop outside of Plaintiff's home, this Court would have
upheld it as reasonable under the Fourth Amendment.  *See e.g.*, *United States v. Gil*, 204
F.3d 1347, 1349-51 (11th Cir. 2000) ("to maintain the safety of the officers . . . handcuffing
[plaintiff] and detaining her . . . was reasonable); *United States v. Fields*, 178 Fed. Appx.
890, 893 (11th Cir. 2006) (finding police officers may handcuff detainees "to protect
themselves or to maintain the status quo.").

Nevertheless, the Constitution draws a "firm line at the entrance to the house," and
a warrantless arrest without consent, probable cause, or exigent circumstances is per se
unreasonable under the Fourth Amendment.  *Payton*, 445 U.S. at 590.  In the absence of
these "stringent circumstances, for the purpose of arresting a person without a warrant,
any physical invasion of the structure of the hone, 'by even a fraction of an inch' [is] too
much.'" *Moore*, 806 F.3d at 1043 (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)).

Even though defendants cite to case law upholding an officer's ability to "handcuff
or otherwise restrain a suspect during an investigatory stop . . . to maintain the status
quo," such arguments are unavailing where none of the cases cited by Defendants
concern investigatory stops *within the home*.  *See e.g., United States v. Gil*, 204 F.3d
1347, 1349-51 (11th Cir. 2000) (finding that officers reasonably detained plaintiff in the
back of a police car to maintain officer safety when they pulled plaintiff over "several
blocks from [her] house."); *Williams*, 185 Fed. Appx. at 869 (concluding that an officer's
decision to handcuff plaintiff "as he approached [his home]" was supported by reasonable

suspicion under *Terry*).   The decisions cited by Defendants likewise precede relevant Eleventh Circuit precedents *McClish,* 483 F.3d at 1231, and *Moore v. Pederson*, 806 F.3d at 1039.

That said, this Court confines the unreasonable seizure solely to the five minutes and thirty-seven seconds that Plaintiff was in handcuffs.   In deciding whether an officer has restrained a citizen's liberty, courts ask whether "a reasonable person would feel free to terminate the encounter[.]"   *United States v. Drayton*, 536 U.S. 194, 200 (2002)); *see also Florida v. Bostick*, 501 U.S. 429, 501 (1991) ("[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. . . We have said before that the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (cleaned up).   Immediately after Officer Termaat removed Plaintiff's handcuffs, Plaintiff tried to terminate the encounter by instructing the officers to "get the fuck out" of his home.   *Id.* at 07:00-07:12.   He moved freely throughout the apartment without officer supervision.   He came to the kitchen from his bedroom to wipe his tears and even hugged Officers Termaat and Casanova.   *See id.* at 14:59-15:02. Under these circumstances, we cannot conclude that a reasonable person in Plaintiff's shoes would have felt that he was "not at liberty to ignore police presence and go about his business."   *Bostick*, 501 U.S. at 501.

Having determined that Officer Termaat violated Plaintiff's Fourth Amendment right against unreasonable seizure, we now turn to examine whether this right was clearly established at the time of the incident.   The "critical inquiry" at this stage of a qualified

immunity determination is whether the law is so clearly established so as to provide the officer with "fair warning" that his conduct violated the Fourth Amendment. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In light of relevant Eleventh Circuit precedents, namely, *McClish* and *Moore*, this Court finds that it is. In *McClish*, the Eleventh Circuit considered the constitutionality of an arrest where an officer lacking probable cause, exigent circumstances, or consent to enter plaintiff's home, "reached into [the] house, grabbed [plaintiff], and forcibly pulled him out onto the porch" to arrest him. *See McClish*, 483 F.3d at 1231. In concluding that the Officer's arrest violated the Fourth Amendment, the Eleventh Circuit determined that "[a]lthough [the officer] may have only briefly intruded into the home, [plaintiff's] location at the time of the arrest – firmly standing within his living room, completely behind the threshold – means that [the officer] crossed *Payton's* firm line." *Id*. at 1242. Likewise, in *Moore*, a police officer approached a plaintiff's residence after receiving reports of a parking-lot disturbance. *See Moore*, 806 F.3d at 1039. While standing in the doorway to plaintiff's home, and after multiple refusals by the plaintiff to provide information, the officer furnished his handcuffs and instructed plaintiff to place his hands behind his back. *See id*. The officer then reached into plaintiff's home, handcuffed him, and arrested him. *See id.* The Eleventh Circuit ultimately granted qualified immunity to the officer where "the law was not clearly established *until today* that [the officer] lacked probable cause to arrest [plaintiff] since he could not conduct a *Terry*-like stop in the home absent exigent circumstances." *See id.* at 1053 (emphasis added).

On this basis, Officer Termaat's decision to handcuff Plaintiff's within his home violated Plaintiff's Fourth Amendment protections against unreasonable seizure and contravened clearly established law. As such, he is not entitled to qualified immunity as

to Plaintiff's Count I claim; Defendants' Motion for Summary Judgment (DE [57]) is **DENIED** as to Officer Termaat in Count I and Plaintiff's Motion for Partial Summary Judgment (DE [60]) is **GRANTED** as to Officer Termaat in Count I.

     b. <u>Unreasonable Seizure, All Other Officers (Icobelli, Casanova, Crevier, Mirabal, Roccisano)</u>

As to all remaining officers, Icobelli, Casanova, Crevier, Mirabal, and Roccisano, both parties have moved for summary judgment on Plaintiff's Fourth Amendment seizure claim.  Defendants argue that the decision to handcuff Plaintiff was made solely by Officer Termaat.  *See* (Defs.' Mot. (DE [57]) at 5).  Defendants further contend that the officers' mere presence with Officer Termaat is not enough where the officers were not involved in the decision to arrest Plaintiff.  *See* (Defs. Opp. (DE [74]) at 3-4).  Plaintiff counters that the officers actively participated in Plaintiff's arrest where all of the officers "gathered and discussed their plan of action and executed it accordingly."  (Pl.'s Opp. (DE [76]) at 9).  Plaintiff continues that, the mere fact that Defendants did not handcuff Plaintiff is insufficient to relieve them of § 1983 liability.  *See id.* (citing *Jones v. Cannon*, 174 F. 3d 1271, 1283–84 (11th Cir. 1999)).

To establish § 1983 liability, a Plaintiff must demonstrate "proof of an affirmative causal connection" between an official's acts or omissions and the allegedly unconstitutional conduct.  *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).  "A participant in an arrest, even if not the arresting officer, may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way."  *See Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013) (citing *Jones*, 174 F.3d at 1286).  However, an officer's mere presence at the scene of an arrest "is not enough, unless the plaintiff

24

can "show that the [officers were] part of the chain of command authorizing the arrest action." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010).

Nothing in the record indicates that the remaining officers knew of or discussed Officer Termaat's decision to handcuff Plaintiff. In fact, the remaining officers worked quickly to determine Plaintiff's identity to have him released from the handcuffs. Given the ancillary and limited role of Officers Icobelli, Casanova, Crevier, Mirabal, and Roccisano in the decision to handcuff Plaintiff, the Court finds that they are entitled to qualified immunity as to Plaintiff's fourth amendment unreasonable seizure claim. As such, Defendants' Motion for Summary Judgment (DE [57]) is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment (DE [60]) is **DENIED** as to Officers Casanova, Crevier, Mirabal, and Roccisano as to Plaintiff's unlawful seizure claim (Count I).

### B. Statutory Immunity for Individual Defendants

As for Plaintiff's state law claims against the individual Officers–False Arrest (Count III), Trespass (Count V), and Invasion of Privacy (Count VII)–Defendants maintain that they are insulated from liability under Florida Statutes § 768.28(9)(a).

The statute provides, in pertinent part:

> *No officer, employee, or agent of the state or of any of its subdivisions* shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the *scope of her or his employment or function, unless such officer, employee or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*

Fla. Stat. § 768.28(9)(a) (emphasis added). Put simply, Florida and its subdivisions have waived sovereign immunity for intentional torts committed within the scope of an officer's employment, unless such officer acted in bad faith or with malicious purpose. Florida

Courts have equated "bad faith" with the "actual malice standard." *See Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020). "Malicious purpose" in the context of § 768.28(9)(a) has been equated with a showing of "ill will, hatred, spite, [or] evil intent." *Id.* "[W]hether an act was committed with malicious purpose, bad faith, or with wanton and willful disregard is not a question that must be submitted to a jury, but rather, can be decided by the Court depending on the facts." *Blue v. Miami-Dade Cnty.*, No. 10-23599-CIV, 2011 WL 2447699, at *2 (S.D. Fla. June 15, 2011) (citing *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004)).

Defendants contend that they are entitled to summary judgment on Plaintiff's state law claims where the officers' actions could not be considered "in bad faith," "malicious," or "in a manner exhibiting wanton and willful disregard of human rights." This Court agrees.

As set forth more fully above, the officers' actions, even where potentially violative of the Fourth Amendment, do not constitute bad faith. The officers mistakenly identified Plaintiff because he bore a physical resemblance to the suspect and where a vehicle matching the suspect's car was parked outside of a window to Plaintiff's apartment. *See* (Defs.' SOMF (DE [58]) at ¶7); (Pl.'s Opp. SOMF (DE [75]) at ¶7). The officers tried to explain the circumstances to Plaintiff and even comforted him. On this record, Plaintiff has failed to overcome statutory immunity and hold that the individual Defendants are entitled to statutory immunity under § 768.28(9)(a). Accordingly, Defendants' Motion for Summary Judgment (DE [57]) is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment (DE [60]) is **DENIED** as to Plaintiff's state law claims against the individual officers (Counts III, V, and VII).

26

## C. Tort Claims Against the City (Counts IV, VI, and VIII)

Both parties move for summary judgment on the Plaintiff's state claims against the City for False Imprisonment/Arrest (Count IV), Trespass (Count VI), and Invasion of Privacy (Count VIII).  Plaintiff alleges mutually exclusive theories against the individual officers and Hallandale Beach.  In so doing, Plaintiff contends that Hallandale Beach is liable for the acts of its officers "up and until it has been shown that the employee's actions were done" in bad faith and/or malicious purpose outside of the scope of their employment.  *See* (Pl.'s Mot. (DE [60]) at 12).  Defendants do not dispute Plaintiff's interpretation of § 768.28 and, instead, explain why Plaintiff's state law claims fail on the merits.  Accordingly, we consider whether either party has sufficiently demonstrated that they are entitled to summary judgment as to Plaintiff's claims under Florida law.

### a.  False Imprisonment/Arrest

"[U]nder Florida law, false arrest and false imprisonment are different labels for the same cause of action."  *Rankin v. Evans*, 133 F.3d 1425, 1430 n.5 (11th Cir. 1998) (quotation marks omitted).  To state a cause of action for false imprisonment, the plaintiff must establish: '(1) the unlawful detention and deprivation of liberty of a person (2) against that person's will (3) without legal authority or 'color of authority' . . . (4) which is unreasonable and unwarranted under the circumstances."  *Archer v. City of Winter Haven*, 846 Fed. Appx. 759, 763 (11th Cir. 2021) (quoting *Johnson v. Weiner, 155 Fla. 169, 171* (Fla. 1944)). "In a false imprisonment action, the plaintiff is required only to 'establish imprisonment contrary to his will and the unlawfulness of the detention.'" *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir. 2006) (citations omitted)

Plaintiff contends that Hallandale Beach is liable for false arrest where his detention was unlawful and "deprived him of his liberty against his will." *See* (Pl.'s Mot. (DE [60]) at 13.  He adds that the arrest was unreasonable under the circumstances. Plaintiff maintains that the officers arrested him without a warrant, inside of Plaintiff's home, that no crime had been committed or observed by the officers, and where he was not the intended suspect. *See id.* Defendants argue that Plaintiff was not arrested. *See* (Defs. Mot. (DE [57]) at 8-9.  They contend that no charges were filed against Plaintiff and that he was merely detained for five minutes. *See id.* Defendants add that the detention was supported by reasonable suspicion. *See id.* at 9-10.

"The existence of probable cause constitutes an affirmative defense to the claims of false arrest and imprisonment under Florida law." *Rankin*, 133 F.3d at 1436.  "In determining whether probable cause exist[s], we consider whether the officer's actions were 'objectively reasonable' based on the 'totality of the circumstances.'" *Williams v. City of Homestead*, 206 Fed. Appx. 886, 888 (11th Cir. 2006) (quoting *Rankin*, 133 F.3d at 1435).

Defendants here do not assert that probable cause existed to detain Plaintiff. Rather, they maintain that "[Officer] Termaat possessed reasonable suspicion for the brief detention [of Plaintiff]." *See* (Defs.' Mot. (DE [57]) at 9); (Defs.' Reply (DE [74]) at 5) ("Here, the totality of the circumstances clearly created reasonable suspicion for Termaat's brief detention of Plaintiff.").  Under the circumstances, this Court finds Plaintiff's false arrest and imprisonment claim fail.  As discussed in connection with Plaintiff's Fourth Amendment unlawful seizure claim, notwithstanding Officer Termaat's decision to handcuff Plaintiff *inside of his home*, the detention of Plaintiff would have been

reasonable under the circumstances.  Officers handcuffed Plaintiff for five minutes and thirty-seven seconds.  They did so based upon their belief that Plaintiff resembled the photo of a violent suspect and, relatedly, out of concern for officer safety.  In light of the various appliances, including two sets of knife blocks, Officer Termaat understandably expressed a concern for his safety, Plaintiff's, and that of his fellow officers.

Under Florida law, while probable cause may constitute an "affirmative defense," a lack of probable cause does not automatically render Plaintiff's detention unreasonable. Accordingly, Defendants' Motion for Summary Judgment (DE [57]) is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment (DE [60]) is **DENIED** as to Plaintiff's false arrest/imprisonment claim against Hallandale Beach (Count IV).

   b.   Trespass

Civil trespass "occurs when there is an injury to or use of the land of another by one having no right or authority."  *Winselmann v. Reynolds*, 690 So.2d 1325, 1327 (Fla. 3d DCA 1997).  To "recover for a trespass, the plaintiff must have been the owner or rightfully in possession of the land at the time of the trespass."  *Gunning v. Equestleader.com, Inc.*, 253 So. 3d 646, 648 (Fla. 2d DCA 2017) (citing *Vincent v. Hines*, 79 Fla. 564, 569 (Fla. 1920)).

Plaintiff lives in an apartment rented by his mother and father and maintains that he has a possessory interest in the unit.  Defendants counter that Plaintiff merely enjoys a "right to reside" in the apartment provided by his mother and father, which, they contend, is distinct from a possessory interest.  Defendants add that Plaintiff "impliedly consented" to their entrance.  As a threshold matter, we do not agree that Plaintiff impliedly consented

where there is an outstanding issue of material fact as to the entry of Officers Icobelli and Termaat.  Accordingly, the focus is on whether Plaintiff enjoyed a possessory interest.

Here, Plaintiff has not alleged that he owns or is included within the lease of his parents' apartment.  Aside from stating that he lives there, he asserts no other facts to establish a possessory interest in the property.  On this record, we cannot agree that "residence" is sufficient to establish a possessory interest and a claim for civil trespass. *See Negron v. Selene Fin., LP*, No. 8:16-CV-2231-T-36MAP, 2017 WL 2721827, at *5 (M.D. Fla. June 23, 2017) ("Therefore, where it is clear from the allegations of a complaint that the plaintiff allegedly only had an easement or a right to the use of the subject property, a trial court may dismiss the civil trespass claim).  Accordingly, Defendants' Motion for Summary Judgment (DE [57]) is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment (DE [60]) is **DENIED** as to Plaintiff's civil trespass claim against Hallandale Beach (Count VI).

> c.   Invasion of Privacy

Plaintiff's third claim against Hallandale Beach is for invasion of privacy (intrusion). *See* (Compl. (DE [1]) at 12).  Florida courts recognize four categories of invasion of privacy: (1) Intrusion, *i.e.,* an invasion of Plaintiff's physical solitude or seclusion; (2) Public Disclosure of Private Facts; (3) False Light in the Public Eye, *i.e.,* a privacy theory akin to the law of defamation; and (4) Appropriation, *i.e.,* exploitation of the property value of one's name for monetary gain.  *See Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 161 (Fla. 2003).  Plaintiff proceeds only under the first category: intrusion.  "An intrusion claim has three elements. First, there must be a private quarter. Second, there must be some physical or electronic intrusion into that private quarter.  Third, the intrusion must be highly

offensive to a reasonable person." *Celestine v. Capital One*, 2017 WL 2838185, at *3 (S.D. Fla. June 30, 2017).

Plaintiff argues that Hallandale Beach is liable for intrusion of privacy where (i) his home constitutes a private quarter; (ii) the officers entered his home without a warrant "simply because [Plaintiff] was a Hispanic male; and (iii) where such intrusion would be highly offensive to a reasonable person." *See* (Pl.'s Mot. (DE [60]) at 15). Defendants assert that Plaintiff's claim for intrusion of privacy fails where the "intrusion" onto one's property does not automatically satisfy the requirements of a civil invasion of privacy claim. *See* (Defs.' Reply (DE [74]) at 12). Defendants add that no reasonable person would find the intrusion to be highly offensive. *See id*.

In light of the factual issues surrounding Defendants' entry, which Defendants Termaat and Icobelli have conceded, this Court declines to rule on the cross-motions as to Plaintiff's intrusion claim against Hallandale Beach. As with Defendant Termaat and Icobelli's claim, the factual issue precludes summary judgment. As a result, Defendants' Motion for Summary Judgment (DE [57]) and Plaintiff's Partial Motion for Summary Judgment (DE [60]) are **DENIED** as to Plaintiff's Intrusion of Privacy Claim against Hallandale Beach (Count VIII). Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (DE [57]) and Plaintiff's Partial Motion for Summary Judgment (DE [60]) are **GRANTED IN PART** and **DENIED IN PART** as set forth in this Order.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 11th day of July 2023.

_____
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished to counsel of record via CM/ECF